IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

THADDEUS JASON KAROW,

                              Plaintiff,

        v.

THE ESTATE OF KATHRYN R. HEYDE,
PATRICIA HAZUGA, DR. JOAN HANNULA,
JEFFREY PUGH, REED RICHARDSON,                    OPINION & ORDER
LAUREN NELSON-BOBB,
EMILY BOWE, ANDREW HAND,                          14-cv-395-jdp
DEREK RAISANEN, ROSE SEICHTER,
PETER WALTER, MICHAEL SNIDER,
JAMES CLARK, SCOTT RUEHRDANZ,
SHAWN KIEFFER, WARREN DOHMS, JR.,
SANDRA COOPER, ERIC SPECKHART,
MICHAEL KASTEN, RORY TABER, JR. and
 JAMES LAUNDERVILLE,

                              Defendants.

Pro se plaintiff Thaddeus Jason Karow, an inmate at the Stanley Correctional Institution (SCI), brings this action under 42 U.S.C. § 1983, asserting Eighth Amendment claims against prison officials. Karow contends that defendants failed to provide adequate medical care for his knee and inappropriately shackled him to his bed while he was being treated at a hospital.

Three motions are before the court: (1) Karow's motion for the court's assistance in recruiting counsel; (2) Karow's motion for the court to take judicial notice; and (3) defendants' motion for summary judgment. I will deny the first, grant the second in part, and grant the third. Undisputed facts show that defendants were not deliberately indifferent to Karow's medical condition or the conditions of his confinement, so defendants are entitled

to summary judgment. The grant of summary judgment disposes of all of Karow's claims, so I will dismiss the case.

## UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

### A. Medical care

Karow suffered from pain in his leg, which turned out to be a Methicillin-resistant Staphylococcus aureus (MRSA) infection in his left knee. He asserts denial of medical care claims against defendants Kathryn Heyde, Patricia Scherreiks, Joan Hannula, and Lauren Nelson-Bobb (Medical Defendants). According to Karow, the Medical Defendants failed to diagnose his MRSA infection for five days as his condition deteriorated.

On April 24, 2010, Karow went to the Health Services Unit (HSU) at SCI and saw defendant Kathryn Heyde, a nurse.[1] Although Karow indicated that he had some knee pain, he also directed Heyde to his rectus femoris (one of the four quadriceps) as the source of his pain. Dkt. 59, ¶ 26 and Dkt. 117, ¶ 26. As a nurse, Heyde had no authority to order diagnostic tests. Dkt. 64, ¶ 12. But she examined Karow's knee, took his medical history and vital signs, and performed a physical examination. Dkt. 59, ¶ 26; Dkt. 117, ¶ 26; Dkt. 64, ¶ 12. She also issued him various items to alleviate his pain, including a heat bag, some muscle rub, and an extra pillow. She also issued him a low bunk restriction. Heyde noted that Karow already had ibuprofen from a different medical condition, but Karow told Heyde that

---

[1] Heyde has passed away, and her estate appears on her behalf. Dkt. 79, at 1. Her estate relies on Heyde's notes that she included in Karow's file. Her notes, though hearsay, are admissible because they are statements made for medical diagnosis and contained in business records. *See* Fed. R. Evid. 803(4), (6).

ibuprofen was not effective in treating his pain and asked for stronger pain medication. Dkt. 78, ¶ 2. Heyde had no authority to prescribe pain medication, but she referred Karow to a doctor. Dkt. 59, ¶ 26; Dkt. 61-1, at 9; Dkt. 64, ¶ 13; Dkt. 78-4, at 2; Dkt. 117, ¶ 26. Heyde also told Karow that if his condition did not improve, then he should return to HSU.

Later the same day, Karow returned to HSU and saw a different nurse, defendant Patricia Scherreiks.2 This time, Karow informed the nurse that his pain was "centered in the knee." Dkt. 59, ¶ 27 and Dkt. 117, ¶ 27. Karow also indicated that his pain was "tolerable" and that the pain was not "bad" when he was sitting. Dkt. 59, ¶ 27 and Dkt. 117, ¶ 27. Scherreiks consulted with a doctor who was on call and relayed to the doctor Karow's symptoms and her observations. Dkt. 66, ¶ 11. After this consultation, Scherreiks advised Karow to apply ice to his knee four times a day, to continue taking ibuprofen, and to take Tylenol 325 mg, as prescribed by the on-call doctor. She also gave him crutches. Although Heyde had already referred Karow to a doctor, Scherreiks scheduled an appointment with a doctor to take place in two days.

Two days later, April 26, 2010, Karow showed up for his scheduled appointment to see a doctor at HSU, defendant Joan Hannula. Karow told Hannula that he had been experiencing "tightness and swelling in the left thigh to knee." Dkt. 59, ¶ 29 and Dkt. 117, ¶ 29. Karow denied having a fever, joint pain, or "any history of injury to the area in pain." Dkt. 59, ¶ 29 and Dkt. 117, ¶ 29. Karrow also added that "he thought he might have a strain." Dkt. 64, ¶ 17. Hannula reviewed Karow's medical history and performed a physical examination. Hannula believed that a quadriceps strain caused Karow's pain, and she

---

2 Scherreiks is her former last name, and her current last name is Hazuaga. Dkt. 66. The parties continue to refer to her by her former last name, so I will do so as well for clarity.

recommended massage, heat, and quadriceps stretches. Hannula also prescribed Vicodin to address Karow's pain and discomfort.

The next day, April 27, 2010, Karow returned to HSU and saw Hannula again. Karow indicated that he continued to have tightness in his left quadriceps. Hannula referred Karow to a physical therapist to assess whether electro-stimulation therapy would address Karow's pain. Hannula also prescribed Karow Cyclobenzaprine, a muscle relaxant.

The parties dispute whether Karow saw a physical therapist. According to Karow, he saw a physical therapist, defendant Lauren Nelson-Bobb, on the same day Hannula recommended that he see a physical therapist. Karow alleges that after he informed Nelson-Bobb about his pain, Nelson-Bobb performed electro-stimulation therapy on his left knee and that this therapy caused him "excruciating pain." Dkt. 116, ¶ 21. Nelson-Bobb does not recall treating Karow, Dkt. 62, ¶ 8, and the parties have not produced any record of her treating Karow. Nelson-Bobb points to her time sheet from April 27, 2010, Dkt. 62-1, at 2, which does not show that she saw Karow. Nelson-Bobb also states that she would not have been at SCI at 6:30 p.m. on April 27, 2010, the time Karow claims to have seen Nelson-Bobb. Nelson-Bobb also states that she does not perform electro-stimulation therapy. Dkt. 62, ¶ 14.

Two days later, April 29, 2010, Karow returned to HSU and saw Scherreiks again. Scherreiks observed that Karow's knee had swollen and that his pain had worsened. Scherreiks then consulted with Hannula, who again examined Karow. Apparently at this point, Hannula recognized that Karow had a serious problem: she had Karow sent to an emergency room at Ministry Our Lady of Victory Hospital.  From there Karow was transferred to St. Joseph's Hospital, where he was hospitalized for seven days, from April 29,

2010, to May 6, 2010. At St. Joseph's Hospital, Karow received a variety of medical treatment, including surgery to drain an abscess in his left knee. Dkt. 61-1, at 6-7, 19-22.

## B. Restraints at St. Joseph's Hospital

At St. Joseph's Hospital, Karow was shackled to his hospital bed: his right wrist was shackled to a metal bar at his right side, and both of his ankles were shackled to the lower edge of his bed, forcing him to lie on his back, facing up, whenever he was in bed. The prison security staff removed his shackles during medical procedures. He was allowed to use the lavatory, and his restraints were removed there, although he still had to wear leg irons. He was transported to and from his medical appointments in a wheelchair, but it is unclear whether he was restrained on the wheelchair. But whenever he was in bed, which was most of the seven-day hospital stay, he was in the three-point restraint.

Karow challenges the constitutionality of the restraints, and asserts claims against 17 defendants: nine security officers (Security Defendants), who refused to remove the shackles that bound him to his hospital bed or to remove leg irons when he used the lavatory; six security supervisors (Supervisor Defendants), who supervised and directed the Security Defendants; and two wardens of SCI, one former and one current warden (Wardens), who implemented and enforced the policy on physical restraints.[3]

---

[3] The Security Defendants are Emily Bowe, James Clark, Andrew Hand, Shawn Kieffer, Derek Raisanen, Scott Ruehrdanz, Rose Seichter, Michael Snider, and Peter Walter. The Supervisor Defendants are Sandra Cooper, Warren Dohms, Michael Kasten, James Launderville, Eric Speckhart, and Rory Taber. The Wardens are Jeffrey Pugh, a former warden of SCI, and Reed Richardson, the current warden of SCI.

The manner in which Karow was restrained at the hospital was determined by his security classification under the Wisconsin Department of Corrections and SCI policies. Under these policies, an inmate's security classification depends on a number of non-exclusive factors:

1. Nature of offense and length of sentence;
2. History of escapes;
3. History of assaultive/disruptive behavior;
4. Pending criminal charges;
5. Security threat group affiliation;
6. Hospital staffing requirements;
7. Availability of on-site hospital security;
8. Availability of local law enforcement response;
9. Institution proximity and response time to hospital;
10. Inmate medical condition; and
11. Public perception/notoriety of crimes committed/media interest.

Dkt. 60-4, at 3.

In Karow's case, he was classified as a "medium" security inmate. According to Karow, he has no history of attempted escape. But other factors tip the other way. Karow is serving a sentence of life imprisonment plus 20 years for murder, burglary, and armed robbery. When he was a 14-year-old, he murdered an 80-year-old woman by stabbing her several times in the head and back with her kitchen knife. He then took the victim's car for a joyride. Dkt. 59, ¶ 2 and Dkt. 60-3, at 1. During his incarceration, Karow had at least 51 conduct reports: 15 for disobeying orders; 12 for failure to follow institution policy; 10 for possessing contraband; 9 for disruptive conduct; 3 for damaging or altering property; 1 for fighting; and 1 for making threats.

Under SCI policies, a medium security inmate who stays at a hospital must be "restrained to the hospital bed at all times except when the [inmate] leaves his bed for medical procedures." Dkt. 59, ¶ 45; *see also* Dkt. 60-4, at 4. Partial removal of restraints

6

requires a security supervisor's approval. Complete removal requires a security supervisor's approval and a medical professional's determination that the proposed removal is medically necessary.

## ANALYSIS

### A.  Karow's motion for the court's assistance in recruiting counsel

Karow moves for the court's assistance in recruiting counsel. Dkt. 82. I will deny this motion.

Litigants in civil cases do not have a constitutional right to counsel, and I do not have the authority to appoint counsel to represent a pro se plaintiff in a civil matter. Rather, I can only assist in recruiting counsel who may be willing to serve without compensation. *See* 28 U.S.C. § 1915(e)(1); *Pruitt v. Mote,* 503 F.3d 647, 653-54, 656 (7th Cir. 2007) (en banc) ("Section 1915(e)(1) thus codifies the court's discretionary authority to recruit a lawyer to represent an indigent civil litigant pro bono publico; it 'does not authorize the federal courts to make coercive appointments of counsel.'" (quoting *Mallard v. U.S. Dist. Court for S. Dist. of Iowa*, 490 U.S. 296, 310 (1989)).

Before assisting in recruiting counsel, this court generally requires a pro se litigant to satisfy two requirements. First, the pro se litigant must show that he has made reasonable attempts to recruit counsel on his own. *See Jackson v. Cty. of McLean*, 953 F.2d 1070, 1072-73 (7th Cir. 1992) ("[T]he district judge must first determine if the indigent has made reasonable efforts to retain counsel and was unsuccessful or that the indigent was effectively precluded from making such efforts"). The court requires the pro se litigant to provide the

names and addresses of at least three attorneys who declined to represent him. Karow has satisfied this requirement in his prior motion for counsel. Dkt. 44, at 3.

Second, once the pro se litigant has shown that he made some reasonable attempts to recruit counsel, the court "must examine whether the difficulty of the case—factually and legally—exceeds" his abilities to litigate his claims. *Perez v. Fenoglio*, 792 F.3d 768, 784 (7th Cir. 2015) (internal citation and quotation marks omitted). Assessing the litigant's abilities is a "practical" inquiry, *Santiago v. Walls,* 599 F.3d 749, 762 (7th Cir. 2010), and no fixed requirement exists, *Pruitt*, 503 F.3d at 655. But courts generally consider the litigant's "literacy, communication skills, educational level, and litigation experience" in light of the complexities of the case. *Id*. "The question is not whether a lawyer would present the case more effectively than the pro se plaintiff" but instead whether the pro se litigant can "coherently present [his case] to the judge or jury himself." *Id.*

Here, the complexities of this case do not exceed Karow's abilities to litigate his claims. Karow does not need an expert witness to show that he had a serious medical condition because defendants concede that Karow's condition was serious. Dkt. 58, at 11.

Karow argues that he needs an attorney to prove defendants' deliberate indifference. An attorney could obtain an expert's testimony on accepted professional standards. But given a large number of pro se litigants seeking counsel, the court cannot recruit counsel for every pro se plaintiff who asserts a deliberate indifference claim. And, as discussed below, Karow cannot prevail on his theory that the Medical Defendants should have used diagnostic tests to identify his MRSA infection sooner: that decision is "a classic example of a matter for medical judgment," which is insufficient to show deliberate indifference. *Harper v. Santos*, 847 F.3d 923, 928 (7th Cir. 2017) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 107

(1976). An expert would, at most, "reiterate[] the standard for medical malpractice," *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663 (7th Cir. 2016), so that testimony would be futile. Besides, the facts here are so one-sided that it is difficult to see how an expert would help Karow on any other theory.

Karow also argues that without counsel, he could not obtain unredacted copies of prison policies he sought in his motion to compel. This, too, is not a reason for recruiting him counsel. I granted Karow's motion to compel and directed defendants to produce the requested prison policies subject to redactions. Dkt. 79, at 4. I also explained that if Karow continued to believe that he needed the unredacted portions, then he should explain why. *Id.* Karow has not done that here: he does not provide any reason why he needs the redacted portions of the policies. Not only that, defendants have submitted unredacted copies of the policies under seal for *in camera* review, along with a declaration of a security director who highlighted the security concerns for producing the unredacted copies. I conclude that the redacted portions of the policies do raise security concerns, so it is appropriate to withhold them from Karow himself. But I also conclude that they are not relevant to Karow's claims, so I would not have ordered defendants to produce the unredacted portions, even if Karow had had counsel.

I must also consider Karow's ability to litigate his claims. Karow has completed only a High School Equivalency Diploma. On the other hand, Karow has previous experience litigating without an attorney.[4] Karow has done a capable job of litigating this case so far. His

---

[4] He has litigated Case No. 13-cv-798 before me. He also has two prior cases in the Eastern District of Wisconsin. Case Nos. 01-cv-679 and 99-cv-357. He has one case currently pending in the Eastern District. Case No. 17-cv-76.

summary judgment submissions—his affidavit, briefs, and proposed findings of fact—show that he can present his side of the facts and that he can conduct the essential legal research.

Accordingly, I will deny Karow's motion for the court's assistance in recruiting counsel.

## B.  Karow's motion for judicial notice

Karow also asks the court to take judicial notice of several facts. I will grant his motion in part.

Federal Rule of Evidence 201 allows the court to take judicial notice at "any stage in a proceeding," including the summary judgment stage. *Ochana v. Flores*, 199 F. Supp. 2d 817, 831 (N.D. Ill. 2002) (collecting cases). Under Rule 201, the court "must take judicial notice if a party requests it and the court is supplied with the necessary information." But Rule 201 limits the scope of judicial notice to facts that are not subject to "reasonable dispute." Fed. R. Evid. 201. A fact is not subject to reasonable dispute if it "is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201; *accord Ennenga v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012).

Here, Karow asks that I take judicial notice of five facts:

1. Extra strength Mapap brand is used for temporary relief of minor aches and pains due to headache, muscle aches, backache, minor pain of arthritis, the common cold, toothache, premenstrual and menstrual cramps, and the temporary reduction of fever.

2. Perrigo brand muscle rub is used for temporary relief of minor aches and pains associated with muscles, joints, simple backache, arthritis, strains, bruises, and sprains.

3. A cold pack, otherwise known as cold compress, is a bag, cloth, or sheet that is soaked with water or filled with

> something cold and applied to the body to relieve *minor* pain and inflammation.
>
> 4. That methicillin-restraint Staphylcoccus aureus (MRSA) is a disease that is potentially fatal if left undiagnosed or untreated.
>
> 5. Using mechanical restraints, such as metal leg irons and metal handcuffs, to restrain a person to a stationary, unmovable object creates an unreasonable risk of serious harm to the person being so restrained.

Dkt. 107, at 2-3 (emphasis added). I will take judicial notice of the first two facts: Karow has submitted photographs of labels on the two medicines that support his proposed findings. Dkt. 107-1 and Dkt. 107-2. I will also accept as true the fourth because there is no genuine dispute that MRSA is a serious condition, as defendants concede in their summary judgment brief. Dkt. 58, at 11.

I will deny his motion as to the other facts. As for the third fact, he relies on the Webster College Dictionary's definition, but he altered the definition of a cold-pack to refer only to *minor* pain. As for the fifth, it is not a judicially noticeable fact. It is, rather, the central legal issue in the case, which I will decide on the basis of the evidentiary submissions of the parties, viewed in light of cases applying the Eighth Amendment.

Accordingly, I will accept as true the first, second, and fourth proposed facts. I will consider them in addition to Karow's proposed findings of fact and his other summary judgment submissions.

## C. Defendants' motion for summary judgment

Defendants move for summary judgment on all of Karow's claims. A court must grant summary judgment when no genuine issue of a material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986). Although the court must view the evidence in a light most favorable to the nonmoving party, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Asserted facts must be supported by admissible evidence, and a genuine issue of a material fact "arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008). Inferences that rely on speculation or conjecture do not suffice. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009).

Karow asserts four sets of claims:

1. deliberate-indifference claims against the Medical Defendants for denying Karow adequate medical care;

2. conditions-of-confinement claims against the Security Defendants for inappropriately shackling Karow "around the clock" during his stay at St. Joseph's Hospital;

3. conditions-of-confinement claims against the Supervisor Defendants for directing Security Defendants to shackle Karow "around the clock" during his stay at St. Joseph's Hospital; and

4. official-capacity claims against the Wardens for implementing and enforcing unconstitutional shackling policy.

I consider each set of claims in turn.

### 1. Deliberate-indifference claims for inadequate medical care

The Constitution does not entitle inmates to "comfortable prisons," but "inhumane" prison conditions violate the Eighth Amendment's prohibition against cruel and unusual punishment. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). Conditions-of-confinement claims have many variations, including a deliberate-indifference claim for denial of medical care. *See Rasho v. Elyea*, No. 14-190, 2017

WL 892500, at *4 (7th Cir. Mar. 7, 2017). A deliberate-indifference claim for denial of medical care requires a plaintiff to prove two elements: (1) the plaintiff "suffered from an objectively serious medical condition"; and (2) the defendant was "deliberately indifferent to that condition." *Id*. The Medical Defendants concede that Karow's MRSA infection was a serious condition, so the remaining question is whether the Medical Defendants were deliberately indifferent.

Deliberate indifference requires that a defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. A plaintiff need not show that a defendant "literally ignored" the risk, *Conley v. Birch*, 796 F.3d 742, 748 (7th Cir. 2015) (citation omitted), and the fact that a plaintiff received "some" medical treatment does not preclude a deliberate indifference claim. *See Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en banc). On the other hand, medical malpractice is not deliberate indifference. *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013). As the Seventh Circuit has explained,

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Zaya v. Sood*, No. 15-1470, 836 F.3d 800, 805-06, 2016 WL 4621045, at *3 (7th Cir. Sept. 6, 2016)).

The Seventh Circuit recently provided guidance on several non-exclusive ways in which a plaintiff could show deliberate indifference to a serious medical condition. One way is to show that a medical professional's chosen treatment "departs radically from accepted

professional practice," such that the defendant did not base the treatment decision on any professional judgment at all. *Diggs v. Ghosh*, No. 16-1175, 2017 WL 957201, at *3 (7th Cir. Mar. 13, 2017) (quoting *Zaya*, 836 F.3d at 805). Another is to show that the defendant chose "easier and less efficacious treatment." *Petties*, 836 F.3d at 30; *Rasho*, 2017 WL 892500, at *5. Yet another is to show "inexplicable delay" in providing medical treatment. *Petties*, 836 F.3d at 730.

Here, Karow's case has elements of each method of proof, but mainly he pursues the first way: he contends that the Medical Defendants' decisions departed so radically from the accepted professional standards that they did not base their treatment decisions on professional judgment.

### a. Nurses Heyde and Scherreiks

Karow contends that Heyde and Scherreiks completely disregarded Karow's complaints about pain, but this is completely refuted by the evidence. When Karow visited these defendants at HSU, they each examined him, attempted to manage his pain, and referred him to a doctor. As for Heyde, although she could not prescribe medication, she did what she could as a nurse: conducting a physical examination, referring him to a doctor, telling him to visit HSU again if there was no improvement, issuing various items she thought would alleviate his pain, such as a heat bag and an extra pillow, and ensuring that he had some pain medication. As for Scherreiks, the second nurse who saw Karow, she consulted with the on-call doctor, and based on that consultation, advised Karow, among other things, to take Tylenol 325 mg and gave him crutches. She also scheduled an appointment with a

doctor to take place at HSU in two days. In light of these facts, no reasonable jury could find, as Karow alleges, that Heyde and Scherreiks flat-out ignored Karow's complaints about pain.[5]

Karow also insists that Heyde and Scherreiks should have conducted diagnostic tests to ascertain his problem. But the parties agree that nurses at SCI could not order diagnostic tests and that these defendants instead arranged Karow to see a doctor who could order diagnostic tests. Besides, even if nurses could order diagnostic tests, whether they should have used certain diagnostic techniques is "a classic example of a matter for medical judgment," which is not deliberate indifference. *Harper*, 847 F.3d at 928 (quoting *Estelle*, 429 U.S. at 107).

### b. Doctor Hannula

Claims against Hannula fail for similar reasons. Karow had three separate encounters with Hannula within the span of four days: on April 26, April 27, and April 29, 2010. Karow contends that Hannula "ignored" his pain and should have performed diagnostic tests to detect his MRSA infection. Dkt. 75, at 17-19 and Dkt. 113, at 15-16.

But Hannula did not ignore Karow's pain. She did, in fact, examine Karow, exercised her professional judgment, and diagnosed Karow's problem. She just didn't get it right—at least not as fast as Karow thinks she should have. Hannula initially thought that the source of Karow's pain was his quadriceps based on his complaints about pain and his medical record. She prescribed him Vicodin and Cyclobenzaprine, recommended massage, heat, and

---

[5] And any reasonable jury would find that Karow's characterization of "disabling pain," Dkt. 113, at 12-13, is exaggerated. Even though he argues that his pain "escalat[ed]" between his first visit (one with Heyde) and his visit (one with Scherreiks) on the same day, it is undisputed that during his second visit at HSU, he told Scherreiks that even his escalated pain was "tolerable" and that the pain was not "bad" when sitting. Dkt. 59, ¶ 27 and Dkt. 117, ¶ 27.

quadriceps stretches, and referred him to a physical therapist to see if a therapy that would help. And during her last encounter with Karow on April 29, she observed signs of infection and concluded that he needed treatment at an outside facility. She transferred him right away to an emergency room. Karow argues that Hannula should have conducted diagnostic tests to identify his MRSA infection earlier. But again, this is a prototypical medical determination that falls short of being a cruel and unusual punishment. *Harper*, 847 F.3d at 928 (quoting *Estelle*, 429 U.S. at 107).[6]

Hannula initially misdiagnosed Karow by concluding that he had a problem with his quadriceps, as opposed to a MRSA infection. But no reasonable jury could find that Hannula ignored Karow's pain or that she was otherwise deliberately indifferent to his serious medical need.

### c. Anderson and Nelson-Bobb

Anderson and Nelson-Bobb argue that they had no personal involvement in treating Karow. As for Anderson, while her summary judgment motion was pending, Karow amended his complaint to substitute Anderson with Scherreiks. Dkt. 79, at 2. I granted Karow's motion to amend, so Anderson is dismissed. *Id*.

As for Nelson-Bobb, the parties dispute whether she saw Karow at all. Karow initially did not identify the physical therapist who attempted to treat him, but he instead proceeded against Jane Doe and later identified Nelson-Bobb as the Jane Doe in his amended

---

[6] Karow appears to have had some oral altercation with Hannula. When Hannula recommended electric-stimulation therapy for Karow, he asked her how such therapy would be helpful. Hannula responded that Karow could either accept the treatment or refuse it and go back to his housing unit. Dkt. 47, ¶¶ 76-77. The fact that Hannula's words may have been unkind does not establish deliberate indifference. *See Harper*, 847 F.3d at 928 (holding that a nurse laughing at a patient did not establish deliberate indifference).

complaint. Dkt. 16, ¶ 1 and Dkt. 47, ¶¶ 95. Nelson-Bobb states that she would not have been at SCI on April 27, 2010, at 6:30 p.m., when Karow alleges to have seen her. This calls into question whether Nelson-Bobb was the physical therapist who saw Karow and what basis Karow had to name Nelson-Bobb as the therapist who saw him. But for purposes of summary judgment, I will assume that Nelson-Bobb was the one who saw Karow and adopt his version of the facts.

Karow contends that Nelson-Bobb is at fault for three reasons: (1) she ignored Karow's pain because she did not examine Karow's knee by using diagnostic tests before administering the electro-stimulation therapy; (2) she failed to refer Karow to a doctor after learning that the electro-stimulation therapy did not help him; and (3) she failed to document her treatment.[7] Karow fails to establish a viable claim against Nelson-Bobb under any of these bases.

The first two arguments lack merit because Karow was already being examined by Hannula. It is undisputed that a physical therapist at SCI does not examine a patient and that diagnosing a medical condition is a doctor's responsibility; Nelson-Bobb's role was limited to what a doctor had directed her to do, and she was not required to use diagnostic tests to identify the underlying problem. And Nelson-Bobb did not fail to refer Karow to a physician because he was already seeing one.

As for the third argument, that Nelson-Bobb failed to document her treatment, Karow relies on the Wisconsin Statutes. Dkt. 75, at 20 (citing Wis. Stat. § 448.56(5)). According to

---

[7] Karow is not claiming that Nelson-Bobb intentionally caused Karow pain by physical therapy. Dkt. 75, at 21 ("Nelson-Bobb was deliberately indifferent to the plaintiff's severe pain, not for the electro-stimulation therapy, but for ignoring the plaintiff's serious condition after the failed treatment.").

Karow, Nelson-Bobb had a statutory duty to maintain patient records. *Id*. But he has not shown how failure to keep records could constitute deliberate indifference under the Eighth Amendment. In any event, "a violation of state law is not a ground for a federal civil rights suit." *Guajardo-Palma v. Martinson*, 622 F.3d 801, 806 (7th Cir. 2010).

### 2. Claims for unconstitutional restraints

Karow also challenges the constitutionality of the physical restraints on him at St. Joseph's Hospital. There, his right wrist and both of his ankles were shackled to his hospital bed. But he was free from his restraints at times: when he used the lavatory, he was unshackled, even though had leg irons; he was free from restraints during the medical procedures; and while being transported to medical appointments, he was in a wheelchair. So he was not quite shackled "around the clock" to his bed, as he initially alleged. Dkt. 47, ¶ 155.[8] The parties agree that Karow was not free from restraints until May 6, 2010, the day he left St. Joseph's Hospital.

Physical restrictions on one's liberty are an inevitable consequence of imprisonment. But the use of overly restrictive and unnecessary security measures, including physical restraints, can violate the Eighth Amendment's prohibition against cruel and unusual punishment. *Hope v. Pelzer*, 536 U.S. 730, 737 (2002). A conditions-of-confinement claim challenging physical restraints is subject to the familiar deliberate-indifference analysis. *See Gruenberg v. Gempeler*, 697 F.3d 573, 579 (7th Cir. 2012).[9]

---

[8] For the purposes of this opinion, I will presume that Karow's restraints were made out of metal that could cause him pain.

[9] There is some authority that suggests that physical restraints cases should be analyzed under the excessive force framework. *Young v. Martin*, 801 F.3d 172, 177 (3d Cir. 2015). But the Seventh Circuit has assessed the constitutionality of physical restraints under the conditions-of-confinement framework. *See, e.g.*, *Gruenberg*, 697 F.3d at 579; *Payette v.*

First, a plaintiff must show that the physical restraints are severe enough to amount to the deprivation of "the minimal civilized measure of life's necessities." *Gruenberg*, 697 F.3d at 579 (7th Cir. 2012) (quoting *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir.2008)). Examples of such extreme deprivation include: exposing the inmate to substantial risks of bodily harm without justification, inflicting unnecessary pain, causing unnecessary humiliation, or offending contemporary standards of human decency.[10] And "[t]he whole is sometimes greater than the sum of the parts: the cumulative effect of the indignities, deprivations, and constraints to which inmates are subjected determines whether they are receiving cruel and unusual punishment." *Bruscino v. Carlson*, 854 F.2d 162, 166 (7th Cir. 1988). But in all cases, the deprivation caused by the physical restraints must be extreme to violate the Eighth Amendment. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) ("extreme deprivations are required to make out a conditions-of-confinement claim"); *Cunningham v. Eyman*, 17 F. App'x 449, 453 (7th Cir. 2001) (reasoning that shackling an inmate for 16 hours, four to five hours of which were spent in soiled clothing, is not so "extreme" as to satisfy the high threshold of the Eighth Amendment).

But the analysis does not end with the extent of restraint: the court must assess the challenged use of physical restraints "against the background of an extraordinary history of

---

*Hoenisch*, 284 F. App'x 348, 352 (7th Cir. 2008); *Bruscino v. Carlson*, 854 F.2d 162, 166 (7th Cir. 1988). And Karow pursues conditions-of-confinement claims.

[10] *Hope*, 536 U.S. at 738 (shackling an inmate to a post for seven hours in the hot June Alabama sun, giving water only twice, with no bathroom break violates the Eighth Amendment); *Spain v. Procunier*, 600 F.2d 189, 197 (9th Cir. 1979) (chains around an inmate's neck was cruel and unusual because there was "no justification at all for requiring the prisoners to bear the visible burdens of neck chains during all visits to family, friends, and counsel"); *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 574 (6th Cir. 2013) (shackling a pregnant woman during labor when she posed no flight risk violates "contemporary standards of human decency.").

inmate violence and with proper regard for the limited competence of federal judges to micromanage prisons." *Bruscino*, 854 F.2d at 165 (citation omitted). As the Seventh Circuit has explained, conditions of confinement "'reasonably related to a legitimate and non-punitive government goal,' are not unconstitutional." *Board. v. Farnham*, 394 F.3d 469, 477 (7th Cir. 2005) (quoting *Antonelli v. Sheahan*, 81 F.3d 1422, 1427-28 (7th Cir. 1996)). And when it comes to security matters, courts must give prison administrators "wide-ranging deference in the adoption and execution of policies and practices." *United States v. Tokash*, 282 F.3d 962, 972 (7th Cir. 2002); *see also Scarver v. Litscher*, 434 F.3d 972, 976 (7th Cir. 2006).

A plaintiff must also establish that a defendant was "deliberately indifferent." *Gruenberg*, 697 F.3d at 579. As noted above, deliberate indifference means that the defendant both knew and disregarded the underlying deprivation. *See Farmer*, 511 U.S. at 837. For example, shackling an inmate for seven days without medical treatment, even after being alerted to the inmate's medical need by the hospital, could show that the defendant was deliberately indifferent. *See Payette v. Hoenisch*, 284 F. App'x 348, 352 (7th Cir. 2008) (citing *Farmer*, 511 U.S. at 837). Likewise, ignoring an inmate's complaints that a particular restraint caused him unnecessary pain could show deliberate indifference. *See Stewart v. Special Adm'r of Estate of Mesrobian*, 559 F. App'x 543, 548 (7th Cir. 2014) (holding that allegations that a security box placed over handcuffs caused pain for an inmate with carpal tunnel syndrome and bursitis stated an Eighth Amendment claim).

With these principles in mind, I now turn to Karow's claims.

### a. Security Defendants

Karow contends that the Security Defendants violated his Eighth Amendment rights in two ways: (1) the shackles caused him pain, soreness, loss of appetite, difficulties sleeping, difficulties eating due to limited movement, and discomfort; and (2) by not releasing him from the shackles, the Security Defendants denied him personal hygiene. Dkt. 75, at 23 and Dkt. 113, at 20. Both theories fail.

To be clear, if the Security Defendants had placed shackles on Karow in a way that exacerbated his MRSA infection, interfered with his medical treatment, or caused unnecessary pain in his left knee that had just undergone surgery, Karow would have a much stronger claim. But that is not the case here. Such facts are conspicuously absent in his proposed findings of fact or declaration. So it is undisputed that his shackles did not interfere with his recovery from surgery.[11] And even if he had adduced his own testimony to show that the shackles affected his left knee, no reasonable jury could believe it. While at St. Joseph's Hospital, the hospital staff visited Karow at least three times per day to monitor the condition in his left knee. The staff gathered various information from Karow, including whether he experienced pain. Karow never complained to the medical staff that the shackles caused him pain during his entire seven-day stay at the hospital. Not once.[12]

---

[11] The only reference to knee pain is to the one caused by bending his knees while using the lavatory. Dkt. 78, ¶ 26 and Dkt. 116, ¶ 43. Karow suggests that wearing leg irons while using the lavatory caused knee pain because the leg irons forced him to bend his knees. But people bend their knees while seating on toilets, so if Karow bent his knees, it is not because of his leg irons.

[12] The same is true for loss of appetite or difficulties sleeping. Karow denied having these symptoms to the hospital staff. Accordingly, his allegations that the shackles caused him pain, loss of appetite, and difficulties sleeping are blatantly contradicted by the record.

Karow's complaint is, then, based on pain, discomfort, and other effects of the shackles that did not affect his medical condition in his left knee. Those effects fall short of being so serious to be constitutional violations. The Security Defendants' failure to make him comfortable is not a cruel and unusual punishment. *Hines v. Sheahan*, 845 F. Supp. 1265, 1269 (N.D. Ill. 1994). The fact that Karow was a patient at a hospital makes little difference, so long as his recovery was unimpeded. *See, e.g.*, *Flores v. Sheriff of Cook Cty.*, No. 10-cv-8040, 2014 WL 1031494, at *5 (N.D. Ill. Mar. 18, 2014) (being shackled to the bed and using a bed pan and urine collection device in place of a bathroom is not a constitutional violation).

Besides, the fact that he was receiving constant medical supervision shows that the Security Defendants were not deliberately indifferent. *See May v. Trancoso*, 412 F. App'x 899, 904 (7th Cir. 2011) (concluding that a corrections officer did not act with deliberate indifference to state prisoner's shoulder injury by leaving prisoner handcuffed despite his complaints of pain, where the prisoner received medical treatment before and after the cuffing). This constant monitoring of Karow's medical needs is the "antithesis of deliberate indifference." *Harper*, 847 F.3d at 927.

Yet another reason to grant summary judgment is that the use of shackles had a legitimate and non-punitive purpose. Although Karow posed a limited flight risk immediately after surgery, the possibility of escape is just one way that an inmate could pose a security threat. Other security concerns were apparent here: Karow had a history of violence and more than 50 disciplinary incidents during his incarceration; he was surrounded by civilians, including other patients at the hospital and the medical professionals who treated him; and the hospital was more than 30 minutes away from the prison, so the distance would have caused significant delay in response by the prison staff. Defendants had legitimate interests in

securing an unruly inmate with a history of violence to prevent any incident involving the civilians at the hospital. Perhaps there might have been more comfortable options, such as special plastic handcuffs, as Karow argues. But minor discomforts do not amount to constitutional violations when the restraints are substantially justified by legitimate security concerns.

Karow's second theory is that the conditions of his confinement violated the Eighth Amendment because he was denied personal hygiene. Karow has not alleged any fact in his complaint that would put defendants on notice of this denial-of-hygiene theory; he raises it for the first time at the summary judgment stage, which is not the appropriate time. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002)).

Even if I were to allow Karow to raise his eleventh-hour theory and treat his brief as an amendment to his complaint, his new theory runs into another problem: a temporary restriction on access to personal hygiene would not violate the Eighth Amendment. *See Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988); *Hardaway v. Meyerhoff*, 734 F.3d 740, 744 (7th Cir. 2013) (reasoning that limiting access to showers only once per week does not violate the Eighth Amendment). And Karow does not indicate that he was denied all access to hygiene for one week; he instead alleges only that the Security Defendants denied his "repeated requests" that he be allowed to brush his teeth or to bathe. Dkt. 75, at 23. Karow has failed to allege any hygiene-related deprivation that might plausibly violate the Constitution.

23

### b. Supervisor Defendants and Wardens

According to Karow, the Supervisor Defendants directed the Security Defendants and enforced the unconstitutional shackling policy; the Wardens drafted and implemented the shackling policy. But because there is no underlying constitutional violation, the policy cannot be unconstitutional either.  I will grant summary judgment as to these defendants as well.

CONCLUSION

For the foregoing reasons, I will deny Karow's motion for recruitment of counsel, grant his motion for judicial notice in part, and grant defendants' motion for summary judgment. No claim remains, and I will direct the clerk of court to enter judgment in favor of defendants and close the case.

ORDER

IT IS ORDERED that:

1. Plaintiff's Thaddeus Jason Karow's motion for the court's assistance in recruiting counsel, Dkt. 82, is DENIED.

2. Plaintiff's motion for the court to take judicial notice, Dkt. 107, is GRANTED in part and DENIED in part.

3. Defendants' motion for summary judgment, Dkt. 57, is GRANTED.

24

4. The clerk of court is directed to enter judgment in favor of defendants and close the case.

Entered March 30, 2017.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge